UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



**ANTHONY MEDINA,**

                              Plaintiff,

  Vs.

                                                        COMPLAINT

**NEW YORK STATE DIVISION
OF PAROLE; R. CAMPBELL,**
Parole Officer, New York State
Department Of Corrections and
Community Supervision;
**B. CORSE-JOHNSON,** Senior Parole
Officer, New York State
Department Of Corrections and
Community Supervision;
**JOHN DOE ONE,** Regional Senior
Parole Officer, New York State
Department Of Corrections and
Community Supervision;
**JOHN DOE TWO,** Regional Inter-State Parole
Coordinator, New York State Department
Of Corrections and Community
Supervision; **JANE DOE ONE,**
Intra-State Parole Coordinator,
New York State Department
Of Corrections and Community
Supervision; **CHARLES QUAKENBUSH,**
General Counsel, New York State
Department Of Corrections and
Community Supervision;
**BRUCE J. TURKLE,** Assistant
Attorney General, New York State
Attorney General's Office;
**NEW YORK STATE DEPARTMENT
OF CORRECTIONS AND COMMUNITY
SUPERVISION; SHANE ANDERSON,**
Americans' with Disabilities Act

Coordinator, New York City
Department of Corrections
**MS. CHAPLAIN,** Americans' with
Disabilities Act Coordinator,
New York City Department
of Corrections; **COPELAND,**
Correction Officer, New York City
Department of Corrections;
**MICHELLE BACON,** Disabilities
Rights Coordinator for Inmates,
New York City Department of
Corrections; **BELLEVUE MENS' SHELTER;**
**DANIEL SCHULTZ,** Assistant Attorney
General, New York State Attorney
General's Office; **JASON COLTER;**
**NEW YORK CITY DEPARTMENT OF**
**CORRECTIONS; STATE OF NEW YORK;**
**OKON J. AKPAN,** Law Library Coordinator,
North Infirmary Command, New York City
Department of Corrections; **LOREANO,**
Correction Officer, New York City Department
of Corrections;

In their Individual and Official Capacities,

Defendants.

---

## INTRODUCTION

This is a civil and disabilities rights action filed by Anthony Medina, an incarcerated parolee, for compensatory and punitive damages, and injunctive relief under 42 U.S.C. §§1983, and 1985(2) and (3), Title II of the Americans' with Disabilities Act, 42 U.S.C. §§12131-12133 ("ADA"), Section 504 of the Rehabilitation Act, 29 U.S.C. §794(a) ("Rehab. Act"), and for declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201. The instant action alleges conspiracy, and retaliation in violation of

the First and Fourteenth Amendments to the United States Constitution. While Plaintiff was under parole supervision, officials from the Division of Parole concocted retaliatory schemes against Plaintiff and denied him disability accommodations, jeopardizing Plaintiff's safety and well being to the point of deliberate indifference in violation of the Cruel and Unusual Treatment, Court Access and Equal Protection Clauses of the First , Eighth and Fourteenth Amendments to the United States Constitution; Defendants denied substantive and procedural rights at parole revocation proceedings in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; Defendants violated substantive and procedural due process by delaying and/or failing to provide reasonable disability accommodations during two parole revocation proceedings and similarly failed to reasonably accommodate Plaintiff's visual disability while in the care and custody of the New York City Department of Corrections and the New York State Division of Parole, all of which violated the First and Fourteenth Amendments to the United States Constitution as well as Title II of the Americans' with Disabilities Act and Section 504 of the Rehabilitation Act.

Plaintiff seeks a declaratory judgment that New York *Executive Law 259-i et seq.*, as currently written, implemented, and enforced, favorably treats the deaf and hard of hearing and non-English speaking parolees to the disparaging exclusion of other disabled parolees thus violating the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## JURISDICTION

1. The Court has jurisdiction over Plaintiff's federal constitutional claims under 42 U.S.C. §§1331(1) and 1334(a)(1) and (3) and 1343(a)(4).

2. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1) and (2).

3

## PARTIES

### Plaintiff

3. Plaintiff **Anthony Medina** ("Plaintiff" or "Mr. Medina") is a 42 year old legally blind and physically disabled parolee presently incarcerated at Rikers Island under the joint care and custody of the New York City and State Departments of Corrections for allegedly violating conditions of his parole.

### a.  Plaintiff's Eye Disorders.

4. Plaintiff Medina suffers from *keratoconus*, a degenerative eye disease of the cornea that substantially interferes with his quality of life causing him to heavily rely on various devices, equipment, aids and auxiliary services to see, read, write, walk and to otherwise perform ordinary yet necessary life functions and tasks as able-bodied individuals. For instance, Mr. Medina can only read using a closed circuit television ("CCTV") magnifier capable of enlarging standard print to 32 size font, or if another person reads out loud to him.

5. Mr. Medina also suffers from photophobia, a concomitant malady commonly associated with *Keratoconus*, which makes him highly sensitive to both natural and artificial lighting - symptoms from which cause him to experience acute eye pain,

debilitating headaches, double vision, light flashes, and at its worse, vertigo and nausea that can lead to vomiting.[1]

6. Mr. Medina wears customized contact lenses that restore some visual clarity and increase his distance vision to a small degree. However, wearing the contact lenses exacerbates Medina's light sensitivity.

7. Plaintiff Medina was prescribed Tramadol [2] for his eye pain and headaches, but is now prescribed Methadone in lieu thereof.

8. Plaintiff Medina also suffers from *Amblyopia*, an eye disorder whereby the optic nerve fails to transmit or poorly transmits to the brain thus causing what is known as lazy eye.

9. Plaintiff is also suspected of having *Glaucoma*, which is high pressure in the ocular fluid of the eye.


**b.  Plaintiff's Neuropathy.**


10. Plaintiff Medina also suffers from bilateral neuropathy (i.e., nerve damage) in his arms and hands. The origins of the neuropathy is unknown, but the symptoms thereof include numbness, tingling sensation, muscle spasms, fingers curling in to the palm, hand cramping and pain.

11. Medina's sense of touch is also greatly diminished by the neuropathy, and in conjunction with his underlying eye ailment, which affects his vision acuity and depth perception, the neuropathy substantially interferes with his quality of life. A prime example of this interference is with touch-screen technology. And depending on the

---

[1] The vertigo, nausea and vomiting usually starts to occur when Mr. Medina has been exposed to light for 3 or more consecutive hours.
[2] Tramadol is also known by its generic name "Ultram".

device and software used, Mr. Medina either cannot operate the device or has great difficulty doing so, thus delaying the use and service the device was designed to provide.

12. Plaintiff Medina is presently prescribed Gabapentin [3] 400 mgs. to treat the neuropathy.

**Defendants**

13. Defendant **New York State Division of Parole** ("Division of Parole" or "Parole') is a New York State agency recently unified with the New York State Department of Corrections to both become known under the unified agency name of: New York State Department of Corrections and Community Supervision ("DOCCS"). The Division of Parole, also known as Community Supervision, in relevant part, is responsible for monitoring and supervising all New York State parolees in society following their release from prison, supposedly to help them continue their rehabilitation as well as assist them with reintegrating and re-acclimating to their communities and society as a whole. Parole receives state and federal funding to support its programming, services and operations.

14. Defendant **Ronnesia Campbell** ("Campbell") is a Parole Officer at the Bronx II Field Office, employed by the DOCCS' Division to Parole, responsible for monitoring and supervising a specific case load of parolees, including Plaintiff Medina supposedly to help with rehabilitation and the reintegration and re-acclimation to the community and society as a whole. She is sued in her individual and official capacities.

15. Defendant **B. Corse Johnson** ("Corse") is a Senior Parole Officer at the Bronx II Field Office, employed by the DOCCS Division of Parole, responsible for supervising,

---

[3] Gabapentin is also known by its generic name "Neurontin".

managing, and assisting PO Campbell in her duties of monitoring and supervising parolees, including Plaintiff Medina, supposedly to help with rehabilitation and the reintegration and re-acclimation to the community and society as a whole. She is sued in her individual and official capacities.

16. Defendant **John Doe One** ("Doe One") is the Regional Senior Parole Officer at the Bronx II Field Office, employed by the DOCCS' Division of Parole, responsible for, *inter alia*, supervising and managing all parole officers in the Bronx II field office. He is sued in his individual and official capacities.

17. Defendant **John Doe Two** ("Doe Two"), upon information and belief, whose job title is Regional Inter-State Parole Supervisor, is employed by the New York State Department of Corrections, at the Division of Parole's central office , and is responsible for supervising, managing, and approving the inter-state transfer process for the Bronx II field office for parolees requesting to have their parole transferred to another state or parolees from another state requesting to transfer to the Bronx, New York from another state. He is sued in his individual and official capacities.

18. Defendant **Jane Doe One** ("Jane One"), upon information and belief, whose job title is, Intra-State Parole Coordinator, is employed by the New York State Department of Corrections , at the Division of Parole's central office, and is responsible for processing inter-state transfer applications from New York parolees requesting to have their parole permanently transferred to another state or parolees from another state requesting to transfer to the Bronx, New York from another state. She is sued in her individual and official capacities.

19. Defendant **Charles Quackenbush** ("Quackenbush") is General Counsel for the New York State Department of Corrections and Community Supervision. In that capacity, he is responsible for assisting in the enactment and implementation of DOCCS' rules and regulations, for also ensuring that DOCCS and its employees adhere to and enforce the federal and state Constitutions along with their laws, statutes,

regulations and ordinances, as well as enforcing and complying with court injunctions and other judicial orders and decisions. He is sued in his individual capacity.

20. Defendant **Bruce J. Turkle** ("Turkle") is an Assistant Attorney General ("AAG") with the New York State Attorney General's Office, and upon information and belief, is responsible for, *inter alia*, representing the State of New York, its entities and agencies, and its agents and employees in civil matters. He is sued in his individual capacity.

21. Defendant **Daniel Schultz** ("Schultz") is an Assistant Attorney General with the New York State Attorney General's Office, and upon information and belief, is responsible for, *inter alia*, representing the State of New York, its entities and agencies, and its agents and employees in civil matters. He is sued in his individual capacity.

22. Defendant **New York State Department of Corrections and Community Supervision** ("DOCCS") is an agency of the State of New York responsible for the care and custody of approximately 50,000 inmates in approximately 53 state operated correctional facilities. DOCCS receives state and federal funding to support its programming, services and operations.

23. Defendant **Shane Anderson** ("Anderson") is the Americans' with Disabilities Act Coordinator at North Infirmary Command ("NIC"), responsible for providing reasonable accommodations to disabled inmates at NIC and ensuring compliance with New York City Corrections policies regarding reasonable accommodations. He is sued in his individual and official capacities.

24. Defendant **Ms. Chaplain** ("Chaplain") is the Americans' with Disabilities Act Coordinator at NIC, responsible for providing reasonable accommodations to disabled inmates at NIC and ensuring compliance with New York City Corrections policies regarding reasonable accommodations. She is sued in her individual and official capacities.

25. Defendant **Ms. Copeland** ("Copeland") is a correction officer, assigned to assist the Americans' with Disabilities Act Coordinators throughout New York City Department of Corrections, with the provisions reasonable accommodations to all disabled inmates and ensuring compliance with New York City Corrections policies regarding reasonable accommodations. She is sued in her individual and official capacities.

26. Defendant **Michelle Bacon** ("Bacon") is the Disabilities Rights Coordinator for Inmates for the entire New York City Corrections, responsible for ensuring that programs, services and activities operated by and under control of City Corrections comply with the Rehabilitation Act and ADA. Bacon is also responsible for creating and implementing policies governing the provision of reasonable accommodations and for reviewing all denials of grievances, other complaints, and requests for reasonable accommodations submitted by inmates/parolees with sensorial, physical and mental disabilities. She is sued in her individual and official capacities.

27. Defendant **Bellevue Men's Shelter** ("Bellevue" or "BMS") is a homeless shelter operated by the City of New York providing public assessment to single homeless men ages 18 and over with free screening, and temporary emergency housing. Bellevue receives state and federal funding to support its programming, services and operations.

28. Defendant **Jason Colter** ("Colter") is a civilian who resided with Plaintiff Medina at the Bowery Street Residence. He is sued in his individual capacity.

29. Defendant **New York City Department of Corrections** ("City Corrections") is an agency of the City of New York responsible for the care and custody of detained suspects awaiting resolution of criminal matters, individuals sentenced and serving convictions of one year or less, and parolees awaiting resolution of parole revocation matters. City Corrections receives state and federal funding to support its programming, services and operations.

30. Defendant **State of New York ("**State of New York**")** is a sovereign State and parent body of DOCCS, Division of Parole and City Corrections, and the principle employer of those entities agents and officers.

31. Defendant **Loreano** ("Loreano") is a Correction Officer, shield # 13592, employed by the New York City Department of Corrections assigned to NIC, a jail on Rikers Island.

32. Defendant **Okon J. Akpon** ("Akpon") is the Law Library Coordinator at NIC, responsible for assisting inmates with legal matters and ensuring that the law library is properly equipped with the necessary materials commonly used by inmates to assist their lawyers in legal endeavors and/or for pro se litigation.

## STATEMENTS OF FACTS [4]

### Denied Disability Accommodations by Bellevue Mens Shelter.

33. On October 18, 2019, Mr. Medina was released from Defendant DOCCS custody after serving a 90 day parole violation. Defendants Division of Parole, Corse and Campbell are fully aware that Mr. Medina is legally blind and is dependent on devices and assistance from other people before he was discharge from New York State Corrections.

34. Defendant Division of Parole forcibly made Mr. Medina reside in Defendant Bellevue Mens Shelter ("BMS") with the knowledge that BMS is unable to accommodate Mr. Medina's vision disability.

---

[4] Mr. Medina will be able to provide specific dates and more detail once he obtains access to his date book.

35. Defendant Division of Parole, Campbell and Corse were also aware that at the time of Medina's release from DOCCS' custody that he is classified as seriously mentally ill by the New York State Office of Mental Health, and that he had spent the majority of a 23 years prison term segregated from people, even other prisoners.

36. Mr. Medina is socially inept and has difficulty recognizing social cues which hampers his social acceptance by other people. Defendants Corse and Campbell, DOCCS, and Division of Parole are aware of Medina's social ineptitude, namely because he has been segregated most of his life to a cell. Nonetheless, Defendants made Mr. Medina live at BMS in a dorm setting where his ineptitude would be on display and in an environment where he would be reliant on complete strangers for help with basic tasks as well as navigating BMS, a massive labyrinth building. Defendants knew Mr. Medina would not be able to function at BMS and will be victim prone once the other men learned that he was visually disabled.[5]

37. On November 7, 2019, while Mr. Medina was walking in a dark staircase inside Defendant BMS, three men surrounded him and demanded he give them his jewelry, money and backpack. The backpack contained Mr. Medina's life possessions and his electronic gadgetry. Mr. Medina pushed his way through to try to run down the stairs but he was grabbed. Mr. Medina's three assailants tried to get the backpack but Medina resisted. Mr. Medina was punched in the face so he was forced to fight off his would-be robbers. During the November 7th altercation Mr. Medina's better eye was injured causing him to become totally blind.

38. Mr. Medina reported the incident to the DHS police. Mr. Medina was taken by ambulance to Bellevue Hospital for treatment.

39. DHS police, to cover up their negligence, told the EMS workers that Mr. Medina was suffering a mental breakdown in lieu of the truth, that he was injured during a

---

[5] Within 12 hours Mr. Medina had his coat, watch and legal papers stolen while he was using the bathroom.

robbery attempt. DHS police did this because Mr. Medina was blaming DHS police for not properly patrolling the stairwells and could have prevented his injury.

40. After leaving the hospital Mr. Medina returned to BMS and reported the incident to BMS administrative officials. Mr. Medina also asked for help walking around BMS. Medina explained that he could not find the bathroom, the cafeteria, the exits, and he could not secure his property using the combination lock BMS provided because he is unable to see the numbers on the dial.

41. BMS staff stated that the shelter could not accommodate Mr. Medina in the manner he needed and that he should not remain at BMS because his assailants had not been identified or apprehended.

42. Mr. Medina was told that although BMS was not literally kicking him out, they had no place to house him so if he had some place to go, it was best for him to go there and return to that office every day until an accommodating shelter can be found.

43. For the next couple of days Mr. Medina slept on the train or at his uncle's home and would return to BMS administration office to ask whether an accommodating shelter had be found for him. After 2 or 3 days of this Mr. Medina was driven to Bowery Street Residence shelter. Mr. Medina notified Defendant Campbell of his address change.

44. Mr. Medina notified Defendant Campbell about the November 7th robbery attempt at BMS on his person. Defendant Campbell took photographs of Mr. Medina's injured eye. Mr. Medina also reported the attempted robbery to the New York City Police.

**Retaliatory Conspiracy to Hinder a Proviso of a Legal Settlement.**

12

45. In 2011, Mr. Medina spear headed a class action suit against Defendant DOCCS on behalf of all blind and severely visually impaired inmates in DOCCS custody to redress violations of the ADA and Rehabilitation Act. *See Medina v. DOCCS*, 11 Civ. 197 (SDNY) (LAP)(JLC). In February of 2014, Mr. Medina and the inmate class agreed to a Private Settlement Agreement ("PSA"). This Court approved the PSA on July 22, 2014.

46. Although Mr. Medina had filed other legal actions against DOCCS and its employees prior to the PSA case, the majority of which were filed in New York State courts, the PSA case, and the manner in which Medina organized other inmates, is what placed Mr. Medina on DOCCS' radar out of its 57,000 inmates.[6]

47. In 2015 Plaintiff Medina filed in this Court a civil and disabilities rights complaint against DOCCS and multiple employees and agents alleging various violations of his federal statutory and constitutional rights. See Medina v. Buther, 15 Civ. 1955 (SDNY)(LAP).

48. On February 3, 2017, this Court issued an injunction against DOCCS.  On February 13, 2019, this Court held DOCCS and other named defendants in contempt of its February 3, 2017 order.

49. On September 12, 2019, this Court ordered that Defendant DOCCS pay Medina's attorney $388,069.00 in fees and $58,475.13 in costs, and pay Medina $150,000.00 in compensatory damages.

50. In November of 2019, this Court along with Plaintiff Medina and the parties' lead attorneys had global settlement discussions in Chambers to resolved three federal suits filed by Plaintiff that were then pending against DOCCS and other DOCCS'

---

[6] It is no coincidence that around the same time DOCCS central office designated Mr. Medina a "Close Monitored Case" thus making him a high profile inmate, subjecting him to additional scrutiny by security officials and which caused Medina to be treated differently than other inmates.

employees. See *Medina v. Napoli*, 07 Civ. 497 (WDNY); *Medina v. Barrett*, 14 Civ. 6377 (WDNY); *Medina v. DOCCS*, 15 Civ. 1955 (SDNY).

51. The first part of the settlement the parties agreed that DOCCS will pay the gross total of $500,000.00 to Mr. Medina and his attorney in full satisfaction of all claims against DOCCS and its employees and agents.

52. The second part of the settlement the parties agreed that Defendants DOCCS along with Division of Parole will agree to immediately transfer the remainder of Medina's parole to the State of Illinois ("Illinois" or "Chicago") to allow Medina to live with his fiancée, Waleska Marrero. This term of agreement was conditional on Illinois accepting care and custody of Medina. However, there existed a "Plan B" created by Medina's attorney and Defendants, whereby should Illinois refuse to accept custody of Mr. Medina, Defendants agreed to grant Medina 45 day travel passes, whereby Medina would be allowed to travel to Illinois and remain there for 45 days, residing in the home of Ms. Marrero.[7] And at the conclusion of each 45 day period, Mr. Medina would return to New York to report to his parole officer who would then re-issue another 45 day travel pass. These 45 day travel passes would continuously be re-issued until the expiration of Medina's parole on February 15, 2022.

53. On December 9, 2019, Illinois approved Mr. Medina's inter-state transfer request and accepted custody and to supervise Mr. Medina during the remainder of his parole.

54. On December 13, 2019, Ms. Marrero emailed Ms. Krista Whitlock, Office Specialist, from Illinois' Interstate Compact Unit, whom handled Medina's parole transfer. Ms. Marrero inquired what was to be expected next regarding Mr. Medina's transfer. On December 16, 2019, Ms. Whitlock answered that Illinois approved Mr. Medina's transfer December 9th, so the rest of the process just entailed New York

---

[7] Mr. Medina procured employment in Illinois with Sagebridge Consults, a business consultation firm located in Northern Chicago. Mr. Medina was scheduled to begin work with this firm on October 21, 2019.

arranging a travel time and sending Mr. Medina to Illinois. Ms. Marrero was elated and filled with pure joy and happiness that she and Mr. Medina can finally start their lives together.

55. Considering that Illinois approved the parole transfer and agreed to supervise Medina as soon as he arrived, there is no logical explanation or justifiable reason for Defendants to have kept Mr. Medina in New York after December 9, 2019.

56. Defendants Doe One, Doe Two, Jane One, Quackenbush, Turkle, Shultz, Corse, and Campbell conspired to keep Medina in New York for as long as possible, especially for the holidays and his birthday, to be vindictive and in retaliation for the substantial monetary award he obtained against them in *Medina v. Buther*, 15 Civ. 1955 (SDNY) as well as Medina using the settlement in that case to expedite his transfer to Chicago by thwarting Defendants DOCCS and Division of Parole's normal inter-state transfer process, which Defendants Corse, Campbell, Doe One, Doe Two and Jane One and other parole officials did not like.

57. Defendant Daniel Shultz took the *Medina v. Buther* case, and multiple motion defeats therein, and subsequent settlement personal because, when he initially took over as lead defense counsel for AAG Samuel Yaggy, he had promised his supervisors and Defendants DOCCS and Quackenbush that he would get the February 3, 2017 preliminary injunction reversed and the case disposed of in Defendants favor.

58. Defendant Schultz, within the first months of his tenure as defense counsel, during a telephone conversation with Amy Jane Agnew, counsel for Plaintiff Medina, stated to Ms. Agnew that the February 3rd injunction was obtained because AAG Yaggy, who opposed the motion, was new and did not possess the requisite experience; and had he (Shultz) been counsel for Defendants that she (Ms. Agnew) would have never obtained the injunction. Defendant Shultz further stated that he was now handling the case, not an inexperienced kid, and he was going to right the ship – meaning that the

rest of the litigation was going to be in experienced hands with favorable results for his clients.

59. It is easy to discern that Defendant Shultz took it personal losing the majority of the subsequent motions filed after stating this to Ms. Agnew, to being constantly chastised by the Court for various reasons, and then having to settle the case for $500,000 thus being unable to keep his promise to his supervisors. In an end game comment to Plaintiff's attorney, Ms. Agnew, Defendant Shultz instead of acknowledging that Ms. Agnew won the case fair and square, said that had he had full decisional authority he would have won the case, but it was his own clients who hampered and caused the unfavorable outcome of the case. All this further bolsters the inference that Defendant Shultz feels slighted from winning the case and prevented from keeping his promises to his supervisors. This gave Defendant Shultz motive to interfere in the inter-state parole transfer process thereby delaying Mr. Medina's transfer to Chicago.

60. Defendant Schultz has committed a similar offense previously. During Mr. Medina's first parole revocation proceeding of June 24, 2019, Parole and Mr. Medina negotiated a plea deal. Defendant Schultz somehow learned of the deal and then improperly intervened in said deal by having the parole specialist prosecuting the matter rescind the plea deal and restructure it so that if Mr. Medina wanted the 90 day sentence in lieu of one year incarceration, Medina had to agree to forego taking his pain medication while serving the 90 sentence in DOCCS custody. [8] Fortunately for Mr. Medina DOCCS did not enforce that provision of the deal. However, because Defendant Shultz had the deal restructured and wanted it made part of the parole record, Mr. Medina was hence incarcerated an additional month.

61. On or about December 10th or 11th, 2019, Ms. Marrero spoke to Defendant Campbell be telephone. Defendant Campbell informed Ms. Marrero that the inter-state

---

[8] This is the same medication this Court held that Mr. Medina being without violated the Eighth Amendment to the United States Constitution. See Medina v. Buther, supra.

transfer process was complete. Defendant Campbell identified by organizational name, the rehabilitative and therapeutic programs Mr. Medina would be attending in Illinois and asked Ms. Marrero how Medina will be getting to said programs.

62.  In response, Ms. Marrero informed Defendant Campbell that she knew exactly where the programs were geographically located and she would make sure that Mr. Medina attended all programs because she would be personally driving him to each program and escort him inside. Defendant Campbell said "[g]ood, your fiancé is one for the ages that I wish on no parole officer", and told Ms. Marrero she could come pick Mr. Medina up in the next couple of days.

63. Between December 9th  and January 6, 2020, in furtherance of Defendants' conspiracy, and to intentionally delay Medina from being in Illinois for Christmas, the New Years, and his birthday, Defendants Doe One, Doe Two, Jane One, Quackenbush, Turkle, Schultz, Campbell and Corse did not permit Mr. Medina to go to Illinois under the pretext that they were still reviewing program documents so they could put together a program packet to send Illinois with Medina. The aforementioned Defendants were pursuing personal interests wholly separate and apart from the interests of DOCCS, Division of Parole and the State of New York.

64. Mr. Medina informed Defendant Corse that Defendant Campbell had told Ms. Marrero that all the necessary documents were compiled and that a complete version of his programming file had already been sent to Illinois during the initial stages of the inter-state transfer process. Defendant Corse said that Defendants Doe Two and Jane One now wanted a certified copy of Medina's overall treatment plan from Samaritan Village.

65. Mr. Medina commented why now would Defendants Doe Two and Jane One need this document – causing further unnecessary delay – when Illinois had approved the transfer. Had Illinois not been satisfied with the documentation New York had previously sent they would have stated so as they did with the missing police report.

66. Nonetheless, during an "office report" in mid-December of 2019, Mr. Medina contacted Samaritan Village from Defendant Campbell's office to obtain a certified copy of his treatment plan and after leaving the parole building Mr. Medina went directly to Samaritan Village to retrieve the plan. After speaking with Samaritan Village staff and confirming that a copy of the treatment plan would be ready the next day, Mr. Medina contacted Defendant Campbell and informed her that he would have a certified copy of the plan the next day. Defendant Campbell said that she would be in her office until 4:30 PM the next day, and if Medina had the plan by then, and could make it to her office by 4:30 PM, that he could drop it off with her or leave it with the Duty Officer.

67. The next day Mr. Medina went to Samaritan Village and waited all day for the treatment plan to be prepared because the people who were supposed to put the plan together were ill and did not show to work. In any event, another staff person put the treatment plan together and the Director of Samaritan Village personally handed two copies of said plan to Medina. Mr. Medina then rushed to Defendant Campbell's office and arrived at 3 o'clock. When Medina arrived the entire parole office was closed and the front gate locked. Mr. Medina telephoned Ms. Marrero and told her where he was and about Defendant Campbell's shenanigans.

68. Ms. Marrero became immediately vexed and started crying, asking Mr. Medina why Defendants kept delaying the transfer. Once Plaintiffs Medina and Marrero thought everything was complete and Medina would be on his way to Chicago Defendants Campbell, Corse, Shultz, Turkle, Doe Two and Jane One created another pretextual task to delay Ms. Marrero from retrieving Mr. Medina.

69. The next day, however, Mr. Medina traveled from lower Manhattan back to Defendant Campbell's office in the Bronx and gave the certified treatment plan to the Duty Officer.

70. All this was part of a conspiracy to harass Medina and delay his transfer to Chicago in retaliation for his successful litigation, his circumventing the Division of

Parole's inter-state transfer process, and the additional work Defendants had to promptly do because federal judges, attorneys and certain supervisors were involved.

71. Defendants Corse and Campbell also did not like Mr. Medina's constant submissions requesting transportation accommodations and his statement that he was going to go over their heads if they did not process his accommodation requests and possibly obtain a court order.

72. Defendants Corse, Campbell, Doe Two, Jane One, DOCCS, and Division of Parole kept making excuses and creating pretextual self-imposed ministerial tasks to justify holding Mr. Medina in New York. Defendants did not think anyone, let alone a blind man like Mr. Medina, had the fortitude and wherewithal to get things accomplished so expeditiously. Mr. Medina proved the Defendants wrong to their chagrin.

73. In addition, Defendants Campbell and Corse, when implementing parts of their retaliatory scheme, knowingly and maliciously put Medina's physical safety and well being in harm's way, amounting to deliberate indifference, when they made him travel all over Manhattan and the Bronx, by himself, and without the requested transportation accommodation, since both Defendants, Corse and Campbell, knew Mr. Medina had difficulty travelling on his own, especially at night, and was prone to get hit by cars or injure himself from myriad of human and/or structural obstacles while walking through the city unescorted. This is compounded by the guidance cane used by Mr. Medina, and commonly associated with the blind, made him a target for robbers looking for an easy mark, thus further placing Mr. Medina's safety in jeopardy.

74. Nonetheless, Mr. Medina had the treatment plan in Defendant Campbell's hands within 24 hours from when he walked out of her office.

75. When Mr. Medina inquired as to when he would be allowed to go to Illinois, Defendant Campbell and Corse said that Defendants Doe Two and Jane One needed to review the transfer packet one last time to make sure all was in order.

76. Mr. Medina questioned the veracity of this statement as Illinois had already approved to accept care and custody of Medina, and Defendants Corse, Campbell, Doe One, Doe Two, Jane One, Shultz and Turkle already knew the organizations Mr. Medina was going to be enrolled in for his programming needs once in Illinois.

77. On or about January 6, 2020, Mr. Medina telephoned DOCCS' Office of Inter-State Parole [9] to inquire as to why he was still in New York after December 9, 2019.

78. Mr. Medina's call was answered by Defendant Jane Doe One. Mr. Medina identified himself and concisely explained his situation. Jane One admitted that she was the person whom had compiled the documents and processed Medina's inter-state transfer and sent his file to Illinois. Mr. Medina then adamantly inquired as to the reason he was not in Illinois being that he was originally told that once Illinois approved the transfer he would be allowed to immediately leave New York. Mr. Medina reminded Defendant Jane One that Illinois approved the transfer on December 9, 2019, so why he still in New York.

79. Defendant Jane One and Mr. Medina had a 5 minute conversation in which Jane One gave all types of excuses for Medina still being in New York. Jane One not once mentioned the delay was because DOCCS was re-organizing the program documents or needed a certified program plan from Samaritan Village.

80. Mr. Medina employed a Machiavellian bluff stating that he had just spoken with Illinois parole and Illinois stated that New York had not sent the proper programming documents with the file, so he (Medina) was going to tell the Judge that New York's parole officials were intentionally sabotaging the transfer. Jane One immediately said, "No, no, no! That's not right Mr. Medina. I personally did your transfer papers and the file I sent to Illinois was complete. Everything was in order. I promise you that. I agree, you should be in Illinois. I do not know why you aren't. You need to speak to your parole officer who's in a better position to tell you the reason

---

[9] Plaintiff Medina is not sure if this is the correct name for this office.

you're still in New York." Medina replied with the obvious: how would his parole officer know more when all the transfer information came from Jane One's office to his parole officer. Defendant Jane One continued to tell Medina to contact his parole officer.

81. Mr. Medina then asked Defendant Jane One if the file was complete why then was Defendants Campbell and Corse claiming that her office (i.e., Jane One and Doe Two's office) needed to compile a programming packet for Illinois. Defendant Jane One said in response, that they were maybe saying that to buy time to handle things, something that Medina maybe was not privy to.

82. Mr. Medina then got upset and said to Defendant Jane One how could she say that when she just said that the documents were all complete and the file was in order. Defendant Jane One became flustered and kept trying end the call - which Medina did not allow – and when Jane One refused to say any more on the subject Medina asked to speak with her supervisor.

83. Mr. Medina was put on hold while Jane One presumably spoke with Doe Two. After about 10 minutes on hold (Defendants seemingly expected Medina would get fed up with being on hold and hang up), Jane One came back on the line and said she was going to transfer Medina to her supervisor Defendant John Doe two.

84. Mr. Medina introduced himself and Defendant Doe Two introduced himself by name and tile, and stated he was familiar with Medina's case for he had approved the transfer from New York's end.

85. Mr. Medina succinctly iterated the background of his transfer for Doe Two: while incarcerated serving a 90 day parole violation, New York had originally approved the transfer in August of 2019, but Illinois denied the transfer on a technicality because the transfer packet was missing a police report; Medina then made the parole transfer part of settlement negotiations, whereby the police report was soon thereafter forwarded to Illinois by Defendant Campbell; and that Illinois had approved the transfer and accepted custody and responsibility of Medina's parole on December 9th.

86. Mr. Medina asked why then was he not in Illinois. Defendant Doe Two replied that the Court had not yet approved the settlement. Medina responded that the transfer was not contingent on the settlement being approved by the Court. Doe Two then stated, "Well we're investigating you for assault." When Mr. Medina attempted to ascertain the underlying events for the assault, Doe Two refused to expound and constantly changed the subject.

87. Mr. Medina told Doe Two that an investigation in an assault case was not the reason Defendants Campbell and Corse gave for him still being in New York; that Campbell and Corse said Medina was still in New York because Doe Two's office was compiling a program packet to send along with the transfer papers. Doe Two interjected quickly saying, "This is true Mr. Medina. When we're done you'll be on your way."

88. Mr. Medina replied, "Sir, please stop BSing me. Your colleague who just put me through, and whom admittedly did all the paperwork and communicated with Illinois about my transfer, just told me that she personally put my file together and that every requisite document was there, including the papers containing my programming needs and related history. And let me enlighten you to another thing, my fiancée is in constant communication with the Illinois' Director for Inter-State [Parole] Transfers; and has built a very good rapport with said director, so I know you and the rest of your parole staff are blowing smoke up my butt and are giving me the run-around to be vindictive." Defendant Doe Two responded, "Mr. Medina, by now, with all your litigation experience and years in prison dealing with DOCCS administrators, you should know how the game is played. An inmate having the upper-hand is a hard pill to swallow." He then ended the call.

89. On January 6, 2020, after speaking with Doe Two and Jane One, Medina telephoned his civil attorney and quasi-guardian, Amy Jane Agnew, Esq., and informed her of the conversation with John Doe Two and Jane One.

90. On January 6, 2020, after speaking with Jane One and Doe Two, Mr. Medina telephoned his parole Office, Defendant Campbell. Defendant Campbell did not answer the call so Medina left a voice mail explaining what Defendant Doe Two had told him about being investigated for assault.

91. On January 6, 2020, Mr. Medina also sent a text message to Defendant Campbell again notifying her about Defendant Doe Two saying he was being investigated for assault and asked if she knew anything about it. Medina asked that Defendant Campbell please contact him at her convenience.

92. Later in the evening of January 6, 2020, around 8:00 PM, Defendant Campbell telephoned Mr. Medina in response to his text. Defendant Campbell claimed she knew nothing about Medina being investigated for assault.[10] The first thing Campbell asked Medina was who told him he was being investigated for assault. Mr. Medina answered her that it was Defendant Doe Two, the Regional Inter-State Parole Supervisor.

93. On the Morning of January 7, 2020, after speaking to Campbell the night before, Defendant Campbell made a home visit to BSR shelter with another parole officer. Defendant Campbell asked Medina did he go to Chicago recently to visit his fiancée, Ms. Marrero. Medina replied that he had not. Defendant Campbell also reminded Medina that he had an "office visit" the following day and that he needed to bring her a letter confirming that he had been regularly participating in his programs at Samaritan Village [11] so that "[Defendant Corse] will be more inclined to give a day for Ms. Marrero to come pick you up." Medina said he was going to Samaritan Village later that day to obtain the letter.

---

[10] This is highly specious, for as Medina's parole officer she would be the first to know that Medina was being investigated for any crime. It is inexplicable that Campbell did not know Medina was being investigated, but the Regional Inter-State Parole Supervisor located in Albany, New York knew he was. Moreover, Campbell's question to Medina" who told you you are being investigated" allows the inference that Campbell knew but wanted to know how Medina found out.

[11] During this "home visit" Ms. Campbell claimed to have received an unanimous telephone call informing her that Medina had not been attending his mandatory programs. Medina obtained a letter from Merideth, his social therapist at Samaritan Village stating that Medina had been attending all mandatory programs.

94. Defendant Campbell said to bring the letter and a Xerox copy of Ms. Marrero's license and registration because Defendant Corse would need it tomorrow (January 8th)[12] to give Medina the set date for when Ms. Marrero could come pick him up to finally take him to Chicago.[13]

95. Before terminating the home visit, Defendant Campbell asked Mr. Medina had he heard anything about the assault investigation and why would he be investigated for assault. Mr. Medina replied that the only thing he could think of was the situation with his aunt and the altercation at Bellevue Mens Shelter whereby Mr. Medina fought off 3 guys who attempted to rob him. Ms. Campbell said okay and left.

96. At no time during Defendant Campbell's January 7, 2020 home visit did she mention that earlier that same day upon her entering BSR shelter she incidentally ran into the 2 New York City detectives that were there to arrest Medina for assaulting Defendant Colter.

97. On January 7, 2020, after Defendant Campbell left BSR shelter, New York City police detectives entered BRS shelter and asked Mr. Medina to accompany them to the police station. Mr. Medina grabbed his guidance cane and the detectives escorted him to their car where he was driven to the station. At the police station Medina was arrested for assaulting Defendant Jason Colter and subsequently given a Desk Appearance Ticket for misdemeanor Third Degree Assault. Mr. Medina was then escorted out of the police station and verbally directed towards the nearest subway station.

98. On January 8, 2020, Mr. Medina reported to Defendant Campbell's office in the Bronx. Mr. Medina traveled to Campbell's office by both train and walking unescorted.

---

[12] January 8, 2020 was Mr. Medina's "Office Report Date" when he was required to physically appear before Defendant Campbell at the Bronx II field office.
[13] Ms. Marrero and Medina had previously sent Campbell photographs of Ms. Marrero's license and registration including all Merroro's contact information along with home and employment email address.

99. After Medina provided an negative urine sample, he was handcuffed. Defendant Campbell said she was directed to revoke Mr. Medina's parole release. Mr. Medina told Campbell that the detectives stated the matter was not that serious; even Defendant Campbell who had spoken to the Detectives in the entrance to BSR said she had thought the same and had advised the detectives to release Medina.

100. Mr. Medina told Defendant Campbell that she did not have enough time to thoroughly investigate the incident, so all this was premature. Defendant Campbell replied that she did not get to investigate the matter the way she normally would before revoking someone's parole, that she did not want to revoke Medina's parole, but she followed policy by notifying her supervisors of Medina's arrest, and while it is normally left to her discretion whether to revoke a parolees parole, in Medina's case, direction to revoke his parole came from the Division of Parole's highest level, so she had no choice.

101. On January 27, 2020, this Court entered a order which settled all three suits. The settlement gave Plaintiff Medina and Ms. Marrero, and Medina's attorney (and probably this Court) the impression that Medina's inter-state transfer was completed December 9th and was thus no longer an issue in dispute.

102. It was Plaintiff Medina's understanding that should Illinois deny the inter-state transfer or should another complication interfere with him being transferred to Illinois, that Division of Parole would then grant Mr. Medina a 45 day travel pass and would keep renewing the travel pass for the remainder of Mr. Medina's parole.

103. During the Covid 19 national outbreak, specifically in New York City, Defendant Division of Parole,  Governor Cuomo, assembly members, and the City Council as well as other New York officials agreed - as a prophylactic measure - to free detainees and parolees from New York City jails to prevent the exposure and spread of the Covid 19 virus.

104. Defendant Division of Parole has released hundreds of incarcerated parolees from City jails, some of whom have been accused of serious parole violations and/or a

serious crime, worse than the parole violation  Mr. Medina is accused of, but nonetheless, Defendants Division of Parole, Campbell, Corse, Doe One, Doe Two, Jane One, Shultz and Turkle have consciously colluded to keep Mr. Medina incarcerated at Rikers Island, thus putting him at a higher risk of acquiring the Covid 19 virus, in total disregard to his life, health and well being, as a reprisal for his recent litigation success, and his circumventing the inter-state transfer process, and also because his constant requests for accommodations while under parole supervision. This similarly denied Mr. Medina equal opportunity.

105. Defendant City Corrections, as of the date of this writing, is presently understaffed due to the Covid 19 epidemic.

106. Mr. Medina is presently incarcerated at NIC Annex. The entire Annex building is a medical facility.

107. Since early March of 2020, NIC annex has lacked sufficient medical, mental health and security personnel, which put Mr. Medina's health and safety in constant jeopardy.

108. The jail is also experiencing a shortage of food and medical supplies thus further putting Mr. Medina's health and safety at risk. The food currently being served is nutrient deficient due to the lack of variety thereof, which causes insufficient consumption in the necessary vitamins and minerals the body requires daily.

109. Defendant City of New York is not disseminating gloves, masks, hand sanitizer [14] or disinfectant to Mr. Medina or to the other detainees and correctional employees at NIC annex. This has placed Mr. Medina's life in jeopardy as well as his health and safety.

---

[14] The reason hand sanitizer is not being issued is correction officials claim detainees can drink it to get drunk. Even if this is true, the sanitizer can be kept in the Offices' Station ("Bubble") and disseminated by an officer thus limiting its misuse.

110. Moreover, City Corrections has a vast number of correctional officers and other employees whom have tested positive for Covid 19 or who have been exposed thereto, and who are out sick due to said virus. Nonetheless, City Corrections is prematurely forcing these employees to return to work with threat of penalty while they are still symptomatic or before the virus has had the opportunity to run its course. Hence, this has jeoparded Mr. Medina's health, and literally his life.

111. Furthermore, Mr. Medina is being deprived outdoor recreation and exercise while detainees in NIC main are receiving daily outdoor recreation and exercise.

**Denied Disability Accommodations by Parole.**

a. **Transportation Assistance.**

112. On October 18, 2019, Mr. Medina was released from DOCCS custody after serving a 90 day parole violation.

113. Upon Medina's October 18th release from DOCCS custody, due to his poor eyesight, namely that he cannot see more than 3 feet in front of him, he had difficulty walking New York City on his own. Within Medina's first 2 weeks he was grazed by a car crossing the street. He was then hit by a car while he was crossing the street sustaining minor injuries to his right leg. Then on December 19, 2019, Mr. Medina was hit by another car while getting breakfast this time sustaining serious injury resulting in him being taken to Bellevue Hospital by ambulance. Defendant Campbell is aware of this sequence of events.

114. Mr. Medina had parole mandated and medical and other necessary appointments throughout Manhattan and the Bronx that he was usually late for because he does not know how to use public transportation. Furthermore, he was also late

because he has difficulty finding the location of appointments, and is exacerbated by his inability to see the street signs. And when Mr. Medina is in unfamiliar territory he walks slowly as a safety precaution so that he will not trip and fall or bump into objects or people.

115. In November of 2019, Mr. Medina authored a written request for transportation accommodations addressed to Defendants Corse and Campbell asking that either (a) the Division of Parole pick him up from his residence, transport him to the parole office and then back to his residence, or (b) his parole officer make "home visits" in lieu of requiring Medina to travel to the parole office.

116. The latter request is an accommodation afforded to other parolees with medical conditions, but which was denied to Mr. Medina. This denied Mr. Medina a reasonable accommodation and equal treatment and proves that Defendants Division of Parole, Campbell and Corse were deliberately indifferent to Medina's safety. Mr. Medina sought either of these two accommodations because he was seriously worried about his safety traveling to Defendant Campbell's office.

117. Getting to Defendant Campbell's office took Mr. Medina considerable effort and learned precautionary measures. It was very stressful on Medina's nerves and emotions for fear of injury as well as returning to prison for not appearing at Campbell's office or just appearing belatedly.

118. On the occasions when Mr. Medina was required to report to Defendant Campbell's office, called an "Office Report", Mr. Medina had to walk from the West-side to the East-side of Manhattan to access the 6 train. The 6 line takes him up to the Bronx where the Division of Parole's Bronx II field office is located.

119. Upon exiting the train station in the Bronx, Mr. Medina had to walk a couple of blocks through a rough, drug infested housing projects towards the Bruckner Expressway, and then walk across the Bruckner Boulevard, which consist of two major

four-lane thoroughfares that presented a serious challenge and safety hazard for Medina to get across, especially when it is dark outside.

120. Mr. Medina needs help crossing these four-lane thoroughfares (streets) and can sometimes wait 30 minutes until another person comes along to assist him across 2 of the 3 thoroughfares. Once Mr. Medina crosses the eight-lane Bruckner Boulevard, he has to cross another four-lane thoroughfare street that presents another challenge and hazardous crossing.

121. On a couple of occasions a parole officer has escorted Mr. Medina across the four-lane street he encounters when he exits the parole building. It is often another parolee however who helps Medina across the major thoroughfares when he is returning to the train station.

122. As a result of all these safety hazards Mr. Medina encounters when navigating alone, and that he regularly gets lost, cannot read the street signs, and had already been hit by a car, Mr. Medina sought reasonable transportation accommodations from Defendants Division of Parole, Corse and Campbell.

123. Before being granted *Access-A-Ride* in late December 2019, Mr. Medina asked Defendants Campbell, Corse, and Division of Parole for a transportation accommodation getting to parole related appointments.

124. Said Defendants denied Mr. Medina's reasonable accommodation request for transportation services in total disregard for is life and safety, and subsequently sent Medina all over the city for appointments and to obtain documents for the inter-state transfer.

125. Defendant Campbell said that the Division of Parole does not have a reasonable accommodation process and people who need accommodations from parole find themselves back in prison since they cannot function in society. Mr. Medina took this as the tacit threat that it was. Thus, Medina had to sacrifice his life and safety,

because had he refused to come to the parole office when directed or appear at other parole related appointments, Mr. Medina will have then found himself back in prison and never able to get to Chicago with his family.

126. Mr. Medina then took the request for accommodations to Defendant Corse, Campbell's immediate supervisor. Defendant Corse threatened Medina when he handed her the written request for reasonable transportation accommodations. Mr. Medina gave Defendant Corse DOCCS' *Directive 2612*, which governs, *inter alia*, the process by which the Division of Parole is to accommodate disabled parolees. Defendant Corse stated that since Medina wanted to throw directives in her face that she could have the inter-state transfer process either denied or delayed for a very long time.

127. In late December of 2019, Mr. Medina was granted Access-A-Ride, an organization that transports disabled New Yorkers around the City at the cost of public transportation. This service was done by pre-scheduling a ride in advance, informing the company of your destination, the time of your appointment, and the approximate time for the return trip.

128. Mr. Medina could not use *Access-A-Ride* with his parole "office report" day appointments. He could use Access-A-Ride to get to the parole office, but he could not use that service for his return trip because parole Defendants usually have Medina waiting anywhere from 30 minutes to 5 hours. Thus, Mr. Medina was never able to give Access-A-Ride a specific time for the return trip. The Defendants made Access-A-Ride ineffectual, even after Mr. Medina explained to Defendants how that service operated.

129. During a scheduled report day, Defendant Campbell said to Medina, "Why can't things with you be simple? I hate talking to my bosses, bosses, bosses, boss. We can never discuss you in emails; it always has to be by phone. Don't mess with my money Mr. Medina."

130. Plaintiff Medina had to explain indemnification to Defendant Campbell for fear that she was going to revoke his parole when he mentioned getting a court order for transportation accommodations.

**b. Reading Assistance.**

131. Defendants know that Mr. Medina is legally blind and that he relies on devices and auxiliary services to see, read, write and otherwise effectively communicate as a sighted person.

132. Mr. Medina cannot read unless he uses a device capable of magnifying print to 32 size font or the text itself is enlarged to that font size.

133. During Mr. Medina's first and second parole revocation proceedings, Defendants Division of Parole and City Corrections violated his due process by failing to provide Mr. Medina with either 32 font documents or a CCTV magnification device.

134. Defendants DOCCS and Division of Parole, during both parole revocation proceedings, did not provide Medina with adequate notice of the charged offense nor the particulars underlying the incidents by failing to accommodate his vision disability to allow him to read, digest or understand the charges against him, and Defendants did not afford him the opportunity to read or present evidence in a meaningful way.

135. In addition, while Mr. Medina was incarcerated in City Corrections he was either denied total use of the reading device on certain days or denied sufficient time to use the device on other days. When Mr. Medina was able to use the device he had to choose between personal matters like reading a book, reading correspondence from family and friends, and legal matters like legal research or reviewing the parole papers given to him by Division of Parole.

136. The failure by Defendant Division of Parole to accommodate Mr. Medina during the two revocation proceedings violated not only the ADA and Section 504 of the Rehabilitation Act, but it also infringed on his right to equal treatment.

137. In both instances, considering the absence of large print and/or assistive devices at Mr. Medina's parole proceedings, he did not receive an opportunity to benefit from the parole process that is equal to that of non-disabled parolees.

**Altercation with Jason Colter.**

138. On the morning of December 19, 2019, while Mr. Medina was returning from eating breakfast, he was hit by a car while crossing 25th Street in Manhattan's Westside. Mr. Medina's cell phone, laptop and guidance cane were crushed. Mr. Medina literally crawled the two streets back to BSR shelter where he resided while awaiting to go to Illinois.

139. Once Mr. Medina was back in BSR, a female employee observed him crawling and unable to walk. The same employee also observed that his cell phone was crushed and guidance cane was disfigured and obviously broke. Said female employee inquired into Medina's condition and he told her that he had just gotten hit by a car. Said employee called an ambulance. When EMS arrived Mr. Medina refused to go to the hospital. The BSR employee called Medina's fiancée, Ms. Marrero, and Ms. Marrero told Medina to go to the hospital because there could be internal bleeding. The EMS personnel also said that Medina should go because he was vomiting, a sign that he could possibly have a concussion.

140. Mr. Medina left leg was severely injured and his entire body was bruised and in pain. The slightest movement caused Mr. Medina extreme pain.

141. On December 19, 2019, Mr. Medina was taken by ambulance to Bellevue Hospital. Medina was fearful that he was going to be stuck in the hospital for Christmas and possibly miss his transfer to Chicago, so he signed himself out of the hospital against doctors' orders. Mr. Medina could not walk so he started to crawl his way out of the hospital. While leaving the hospital Mr. Medina continued to throw up. Medina was given a walker[15] and escorted to the front door where his uncle, Christopher Moran, picked him up.

142. On the morning of December 21, 2019, around 7:00 AM, Defendant Campbell made a "home visit" to BSR shelter as is part of Campbell's supervision duties of Mr. Medina. During this "home visit", Mr. Medina went to BSR lobby seated in the walker because he could neither walk nor stand for any length of time. Defendant Campbell asked Medina the reason he was seated and with the walker; Medina showed Campbell the hospital band on his wrist while explaining that he had been hit by a car 2 days prior on December 19, 2019.

143. At the conclusion of the December 21st home visit, Defendant Campbell notified Mr. Medina that she was going on vacation and would return on January 3, 2020.

144. Defendant Campbell reminded Medina that although the transfer was approved that he was to remain in New York because the final part of the transfer process was that she had to personally put him in Ms. Marrero's car. Mr. Medina reminded Defendant Campbell that the transfer was approved December 9th and that she had said that he should have been in Illinois 2 weeks ago, so what was the delay, and how could she put him in the car when she would be on vacation. Defendant Campbell replied:"Good question. Ask the people in Albany who did your transfer."

145. Defendant Campbell then went on a diatribe: "Medina everything with you is out of the ordinary. You should have been in Chicago 2 weeks ago, I know. I

---

[15] This walker could also be used as a wheelchair.

personally submitted your transfer packet to Albany and I checked it a couple of times to make sure everything was there to avoid just this complication so you couldn't cry to the judge. I have no idea why Albany [i.e., Doe Two and Jane One] wants Samaritan's treatment plan when it was already in the packet I sent. Illinois has already approved to receive you and did not ask for your certified treatment plan; and we all know once you get there Illinois is going to generate their own treatment plan. Medina, all I can advise you to do is take it up with Albany, they are the ones making the decisions, telling me what to do and delaying you getting to Illinois. I wish you were gone already so I would not have to deal with all this nonsense. You are one big fat headache. I never seen a inter-state transfer handled like this; no one wants to talk about you in emails. When I say something is supposed to be done this way I am told not to worry about it you are a special case they'll handle it. I'm glad I'm going on vacation and away from all this."

146. There are witnesses and video footage to this December 21, 2019 verbal exchange between Defendant Campbell and Mr. Medina.

147. On December 21, 2019, around 11:15 PM, Mr. Medina entered BSR 6th Floor Techs' Office to talk to a BSR employee named Walter[16] about how he (Medina) could get to another shelter.

148. During the course of Walter and Medina's conversation, at approximately 11:30 PM, Defendant Jason Colter entered the Tech's Office drunk and an hour and a half past curfew to sign for his bed. After Defendant Colter signed for his bed, he interjected himself into the conversation and told Mr. Medina he would kick his ass and the fight will get him (Medina) kicked out of BSR shelter.

149. Mr. Medina observed that Defendant Colter was highly inebriated as he reeked alcohol, had slurred speech and a wobbling gait. Mr. Medina told Colter to go lay down. Mr. Colter then made a derogatory comment to Medina.

---

[16] Walter is now retired from the employ of BSR.

150. When Mr. Medina was exited the office Defendant Colter continued to make derogatory remarks in an attempt to get a reaction from Mr. Medina. Mr. Medina ignored this as he was in no physical condition to fight; and more so because Mr. Medina was consciously aware that a physical altercation constituted a violation of his parole and to do so will ruin his transfer to Chicago. Mr. Medina was desperate to spend Christmas in Chicago with his family.[17]

151. Mr. Medina then went to the bathroom. Defendant Colter was already in the bathroom and upon Mr. Medina entering Colter continued antagonizing Mr. Medina to fight. Mr. Medina told Colter to leave him alone and walked passed Colter to the urinal. That is when Defendant Colter swung at Mr. Medina grazing his ear and striking Medina in the shoulder.

152. As any person is expected to do, reflectively, Mr. Medina took a protective stance by putting both arms straight in the direction of Defendant Colter, palms open , to keep Colter at bay. The open palm of one of Mr. Medina's hands struck Mr. Colter, upon information and belief, in the facial area. Because Defendant Colter was drunk, the force of Mr. Medina's out stretch arm knocked him to the floor.

153. Another resident helped Mr. Medina out of the bathroom back to his bed. Upon information and belief, after Mr. Medina had been escorted out of the bathroom, other residents who had been getting high in the bathroom or who had been using the bathroom robbed Mr. Colter of his money. These residents then robbed Colter of his cigarettes and coffee pot.

154. Plaintiff Medina and Defendant Colter were then escorted out of BSR by members of the Department of Homeless Services ("DHS") police force, and asked if they needed medical attention and if they wanted to press criminal against each other.

---

[17] Because of Defendants' conspiracy to delay Medina's transfer to Chicago Medina had to spend Christmas with his family via video-chat watching his grandkids through a phone open their presents like they were a Macy's commercial.

155. As soon as Mr. Medina exited BSR shelter in the company of DHS police he telephoned Ms. Marrero.

156. On December 21, 2019, both Defendant Colter and Plaintiff Medina declined to press criminal charges against the other. Mr. Medina had a cut lip but he declined medical attention because he was emotionally and physically tired and just wanted to sleep.

157. Upon information and belief, Defendant Colter had a cut bottom lip as well, and an ambulance was called for him.

158. Mr. Medina was on the phone with his fiancée, Ms. Marrero when the DHS officer detaining Mr. Medina told him that he could return upstairs to his bed because Defendant Colter stated he did not want to press criminal charges. Ms. Marrero witnessed this conversation. Mr. Medina then re-entered BSR and returned to his bed.

159. Had Mr. Medina known then that Defendant Colter would later be manipulated and influenced by Defendants Shultz and Turkle to press criminal charges, Mr. Medina would have gone to the hospital for his injury and pressed criminal charges against Defendant Colter.

160. When Mr. Colter returned from the hospital in the early hours of the morning, he apologized to Mr. Medina and explained that he had been drinking. Mr. Medina said that he understood and lay back down in his bed.

161. Defendant Campbell did not investigate Defendant Colter's allegations prior to taking Mr. Medina into custody as she claimed she did. Defendants Corse, Turkle, Shultz, Doe One, Doe Two and Jane One either directed Campbell to disregard normal investigative procedures she would normal perform before revoking a parolee's parole or did not intervene when she learned that the other Defendants had conspired to revoke Mr. Medina's parole without conducting the requisite investigation in retaliation

for his successful litigation and circumvention of the normal inter-state transfer process.[18]

162. During Medina's parole revocation proceeding, Defendant Campbell falsely claimed that she investigated the December 21, 2019 incident prior to revoking Mr. Medina's parole and taking him in to custody.

163. Defendant Campbell's investigation consisted of speaking to Defendant Colter, whom is the complainant witness and alleged victim to the assault, and she also spoke to the arresting detectives, none of which can be said to be neutral to Plaintiff Medina.

164. During the December 21, 2019 altercation between Defendant Colter and Plaintiff Medina, a number of other BSR residents were present and observed the incident. Some residents witnessed the entire incident while others witnessed different segments of the incident. A BSR employee, whom Mr. Medina was talking to, also witnessed the incident. Defendant Campbell did not interview any of these witnesses nor view the video prior to revoking Mr. Media's parole and taking him in to custody.

165. The video will undermine Colter's testimony given at Medina's second preliminary parole hearing. In addition, the medical records reflecting Defendant Colter's injuries are inconsistent with, and undermine, Colter's description of the December 21st incident. Also, certain germane facts standing alone, which Defendant Campbell was fully aware of, discredit Colter's version of events.

166. Mr. Medina was hit by a car 2 days prior to the December 21, 2019 incident with Defendant Colter, and Medina was using a walker to stand and ambulate. In the morning of December 21st - the day of the incident - Defendant Campbell observed Mr. Medina using the walker, yet she disregarded this fact and believed Colter when he

---

[18] An inter-state parole transfer usually takes 4 to 6 months to complete. It can also take longer. Mr. Medina circumvented the normal channels and the process itself by used the settlement to expedite the transfer process thus having his transfer request processed and approved within 2 months.

claimed that a couple hours later Mr. Medina was not using a walker, that he and Mr. Medina did not know each other and had never spoken before, that Medina, for no reason punched him in the back of the head and then stood over him pummeling his face with punches. Defendant Colter's description of events to the Assistant District Attorney is again different than that told to Campbell and of his testimony of the preliminary hearing.[19]

167. The December 21, 2019 medical records do not show Defendant Colter with an injury to back of his head. A bruise would have been apparent for Defendant Colter's entire head is bald.

168. Defendant Colter, a self-admitted professional mixed martial artist who has won trophies in that sport, further said that Medina stood over him pummeling his body and face with punches. The medical records do not reflect a man whose body and face was pummeled. Defendant Colter just had a cut lower lip.

169. It is obvious that Defendant Colter allegations are false and a drastic misrepresentation of the December 21st incident with Mr. Medina. Defendant Colter is a trophy winning mixed martial artist whom was supposedly outmatched and brutally beaten by Medina, a blind man, who was using a walker because he could not stand or walk on his own. Defendant Campbell did not investigate this incident as she claimed she did. Had Defendant Campbell investigated the incident, she would have instantly discerned that Colter was falsifying the facts. However, the truth and due process did not matter since the Defendants had conspired to revoke Mr. Medina's parole no matter what the evidence showed. When Defendant Campbell violated other parolees she conducted the prerequisite investigation prior to revoking their parole.

---

[19] Colter told the Assistant District Attorney that he knows Mr. Medina, and that he and Medina got into an argument and that is why Medina punched him.

170. Upon information and belief, Defendants Shultz and Turkle and others have computer software that tracks a person and informs Defendants when that person's name appears in City and State databases and also social media platforms.

171. Defendants Shultz and Turkle have been using this software to keep track of Mr. Medina since his October 18, 2019 release from DOCCS custody. When Mr. Medina's name appeared in a database for the December 21, 2019 incident, Defendants Turkle and Shultz, or a representative of theirs, approached Defendant Colter and manipulated, influenced, and coerced him with money, clothing and future prospects for housing and employment to press crimnal charges against Mr. Medina.

172. In addition to the software used to monitor Mr. Medina, Defendants Turkle and Shultz have been using the Division of Parole to monitor Mr. Medina since his October 18, 2019 release from DOCCS custody. Defendants Campbell and Corse notified Defendants Turkle and Shultz, or a representative of theirs , about the December 21, 2019 incident. Defendants then approached Defendant Colter and manipulated, influenced, and coerced him with immediate money and clothing and future prospects for housing and employment to press criminal charges against Mr. Medina.

173. In addition to improperly using Spyware software and parole officials to monitor Mr. Medina, Defendants Shultz and Turkle, or a representative of theirs, was contacting people in Mr. Medina's life to monitor him and to ascertain whether Medina was then using or selling drugs, asked if he did either while incarcerated for those 23 years, who medina was associating with, the type of relationship he had with his attorney, Amy Agnew, and sought other intrusive information irrelevant to their representation of Defendants in the *Medina v. Buther* litigation.

174. Defendant Colter appeared at Medina's second preliminary hearing, a stage in the parole revocation process that is to establish probable cause to revoke a parolee's parole.

175.  Defendant Colter, a homeless gentleman, had been cleaned up very nicely by Defendants. He was shaved and well groomed and he was wearing clothing that was beyond his budget and that he had never owned. Essentially, after pressing criminal charges against Mr. Medina, in exchanged for such, Defendants, or someone acting on their behalf, cleaned Defendant Colter's appearance and purchased him new clothing.

176. Defendant Colter falsely testified at Mr. Medina's parole proceeding.

177. Defendant Campbell knowingly solicited and bolstered Colter's false testimony and she also introduced false testimony herself as well as knowingly misrepresented the facts surrounding the December 21, 2019 incident and her investigation thereof.

**Denied Disability Accommodations by City Corrections.**

**178.** On January 8, 2020, Defendants Campbell revoked Mr. Medina's parole and returned him to the custody of City Corrections pending a parole revocation hearing.

179. Mr. Medina was initially incarcerated at the Vernon C. Bain Center located in the Bronx. The following day Mr. Medina was transported to North Infirmary Command ("NIC") Annex in compliance with a federal settlement agreement requiring visually disabled inmates be housed in NIC's Dorm 3 where City Corrections supposedly accommodates the sensorial disabled by making accessible the devices and equipment commonly used by the visually disabled and hearing impaired.

180. At NIC, Defendant City Corrections maintains a SNAP reader in the law library that is somewhat similar in its intended function to the CCTV device regularly used by Mr. Medina.

181. Said SNAP device is antiquated and is accompanied by a slew of malfunctions and inadequacies.

182. One problem with the SNAP device is its camera lens does not auto-focus as originally designed, thus causing the document's text to blur. Similarly, when Mr. Medina attempts to enlarge some documents to a legible size the camera goes out of focus making the document unreadable. Furthermore, the SNAP device is unable to read handwritten documents when it is in audio mode.

183. There is also an aged desktop Dell computer available for Mr. Medina's use in NIC's law library. This computer provides magnification software for the visually disabled.

184. From January 10, 2020 to March 20, 2020, Mr. Medina had access to the SNAP reading device and ADA computer during his housing unit's scheduled law library period.

185. Correction Officer Loreano arbitrarily makes the housing unit's law library schedule based on her biases and neurotic perceptions of the inmate population. Hence, Mr. Medina is denied the allotted 2 hours per day (Tuesday – Saturday) to physically use the law library and the legal materials therein.

186. The SNAP device is Mr. Medina's only means of reading. When Mr. Medina is not in the law library he is unable to read print material.

187. While Mr. Medina was in the law library during his housing unit's scheduled period he was told by Defendants City Corrections, Loreano and Akpon that he could only use the reading device and the ADA computer for legal reasons, not for personal mail or other non-legal related materials. Thus from January 10, 2020 till March 20, 2020, Mr. Medina could not read his mail or read a book or magazine or other non-legal related print materials. Mr. Medina will go days and sometimes a week without being able to read until he finds someone he trust to read out loud to him.

188. In early February, 2020, Mr. Medina submitted a reasonable accommodation request to Defendant City Corrections seeking the following auxiliary devices, equipment, aids and services:

- 20/20 sight saving pens;
- Bold lined paper;
- Portable CCTV device;
- Lamp with low wattage bulb;
- Help with forms/reading documents;
- Large print;
- Free Matter for the Blind postage.

189. On February 14, 2020, Mr. Medina was given a receipt for his reasonable accommodation request.

190. On February 19, 2020, Defendant Anderson provided Mr. Medina with two 20/20 pens and a pad of yellow bold lined paper.

191. Upon receipt of the pens and paper Mr. Medina inquired as to the status of the other accommodation requests. Defendant Anderson stated that Defendant Bacon was still processing them, and that a CCTV device had been ordered for Dorm 3 housing unit.

192. Mr. Medina constantly raised the issue about his need for help with forms and reading documents; he also inquired about the Free Matter postage. Mr. Medina stated to Defendants Anderson and Copeland that it should not take weeks to grant the request to allow someone to help with forms and reading; and that it only takes a telephone call or email to the local Post Office to register him for the Free Matter

postage. Each passing week Mr. Medina asked Defendants Anderson, Chaplain and Copeland about help with completing and reading his mail and documents and registering him for the Free Matter postage.

193. On March 20, 2020, over a month and a half after Mr. Medina's reasonable accommodation request, Defendant Anderson, with the approval of Defendant Bacon, authorized for Mr. Medina to use the SNAP reader to read his personal mail and other documents, and to use social service staff for help with forms.

194. This accommodation did not afford equal opportunity and excluded Medina from services and activities.

195. For instance, regarding help with forms, the social service staff consist of one person whom is rarely ever at NIC.  When the guy from social service is present it is for a few hours during a few days out of the week.

196. When Mr. Medina asks to see social service for help he has to get on a list and days can go by without Mr. Medina receiving help. And now with the *Covid 19 virus* the social service staff has not been at NIC for weeks now.

197. In early March of 2020, Defendants Anderson and Chaplain directed Mr. Medina to the social service office. Social service staff gave Medina a piece of paper (he could not read) with the address and phone number for the local post office and told that is where he is to register for the Free Matter for the Bind postal privilege.

198. Mr. Medina has called the number provided for the Post Office, but his many calls were not answered. Mr. Medina also wrote to the local Post Office to register for the Free Matter postage, but he did not receive a response.

199. Similarly, NIC Dorm 3 is designated an ADA housing area and supposedly employs inmates as aides to help disabled inmates. While Mr. Medina was in Defendants custody he was never directed to receive help from those inmate aides.

200. Regarding writing supplies, Mr. Medina had to wait 2-3 days, and sometimes a week, to be issued a new pen and bold lined paper from Defendants Anderson, Chaplain or Copeland. This consequently delayed and/or prevented him from communicating with family and friends and/or from conducting other matters via written correspondence.

201. Mr. Medina also has nerve damage in both hands which affects his sense of touch. Both the poor vision and neuropathy make it difficult, if not nearly impossible, for him to use the law library's electronic legal research terminals.

202. Mr. Medina cannot see the icons or keypad displayed on the screens, which excludes him from using the research terminals because of his poor vision and Defendants failure to accommodate him.

203. In addition, the screens are touch operated. Hence, Mr. Medina has great difficulty using some touch screen functions while other functions he cannot use at all due to the absence of tactile sensation in his fingers.

204. Defendants City Corrections, Bacon, Copeland, and Chaplain, including NIC's law library staff, Defendants Loreano and Akpan have been aware of Mr. Medina's inability to use the terminals for over a year now and no accommodation or modification has been made.

205. Mr. Medina requested from Defendants City Corrections, Loreano, and Akpan that large terminal screens being installed in the law library for the visually impaired; and that, in addition to the current touch screen feature, the terminals be made to operate by an actual keyboard and a mouse along with audio functions, specifically: voice-to-text and text-to-speech capabilities. Defendants said they would consider implementing these modifications.

206. On March 20, 2020, as a disability accommodation, Mr. Medina was permitted morning access to the law library for a hour or two Monday through

Sunday, even when the law library is closed, to use the reading device and computer for personal reasons. This was normally afforded. However, there are times when Mr. Medina could not access the reading device in the morning because of security situations so he was afforded access during the 1Pm to 9 Pm shift.

207. When Mr. Medina's housing unit was scheduled for law library in the evenings, that is when he used the SNAP device and ADA computer for legal reasons, normally from 7:00 Pm to 8:30 PM.. This evening access was afforded until around April 5, 2020, but then ceased because Defendants Loreano and Akpon claimed that Mr. Medina was receiving special treatment by accessing the law library in the evening when no other inmates were able to, when the real reason is that Defendants fear acquiring the Covid 19 virus, so Defendants Akpon and Loreano misrepresented Mr. Medina's circumstances to their supervisors and was able to rescind Mr. Medina's use of the reading device and ADA computer during the evenings Tuesday – Saturday. Consequently Mr. Medina is denied access to the law library for legal reasons or to read other print material received after 1 PM.

208. Had the reading device not been in the law library than Defendants Loreano and Akpon could not claim Mr. Medina as receiving preferential treatment in the receipt of law library services twice per day nor could they fear getting the Covid 19 virus from him.

209. When Medina is using the reading device in the law library in the mornings he is reading mail from his fiancée, Ms. Marrero, family or friends, or reading a magazine or book or medical literature, or looking at photographs. This cannot possibly constitute law library service when there are no law clerks nor the legal coordinator present with him during these sessions. Medina is unable to use any of the law books or other research materials afforded during library hours; he cannot use the research terminals, the Xerox machine or printer because all are turned off. Defendant Akpon

stated on March 10th and April 21, 2020, that the Courts are closed because of the Covid epidemic and therefore Mr. Medina doe not presently need law library services.

210.  On March 22, 2020, Defendant Akpon filed an email complaint because Mr. Medina was in law library using the reading device after 1 PM.

**211.** Defendants City Corrections did not notify Mr. Medina, verbally or in writing, of his right against discrimination.

212. Defendants City Corrections did not notify Mr. Medina of the availability of disability accommodations.

213. Prior to March 20, 2020, Mr. Medina himself had to go to the jail's law library and search for City Corrections policy on disabilities accommodations. This is not what the ADA requires.


**Unconstitutional New York State Parole Statute**.


214. *New York Executive Law 259-i, Sections 7* and *8,* is unconstitutional for those sections favorably treat and/or grant more rights and benefits to non-English speaking parolees as well as deaf and hard of hearing parolees while disparately treating visually disabled parolees and other disabled parolees by excluding them from receiving the same or equal quality rights.

## STATEMENT OF CLAIMS

### First Claim for Relief

### Violations of the Americans' with Disabilities Act

### (Against DOCCS, Bellevue Mens Shelter, Division of Parole, New York City Corrections, and State of New York)

215. Plaintiff repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

216. Plaintiff is a qualified individual with disabilities as defined by the ADA. He is legally blind and also has nerve damage in both arms and hands, which substantially limits the major life activities of seeing, reading, learning, performing manual tasks, walking, communicating, working, sense of touch, grabbing and holding items.

217. Plaintiff has records of having such disabilities.

218. Defendants are public entities and agents or officials of public entities as that term is defined in 42 U.S.C. § 12131(1)(B).

219. As a state parolee, Plaintiff met the essential eligibility requirements for the receipt of services or participation in programs or activities provided by Defendants.

220. Defendants failed to reasonably accommodate Plaintiff's disabilities in violation of 42 U.S.C. § 12132.

221. Defendants' failure to reasonably accommodate Plaintiff's disabilities excluded him from participation in services, programs and activities and denied him the benefits of such services, programs and activities.

222. The ADA requires that persons with disabilities receive notice of the protections the statute affords.

223. Public entities must make available to beneficiaries, and other interested persons information regarding protections against discrimination. 28 CFR 35.106.

224. Moreover, 28 CFR 35.163 provides public entities shall ensure interested persons, including persons with sensorial disabilities, can obtain information as to the existence and location of accessible services, activities, and facilities.

225. Defendants DOCCS, Division of Parole, BMS and City Corrections, did not provide this information to Plaintiff while he was in Defendants care and custody.

## SECOND CLAIM FOR RELIEF

### Violations of the Section 504 of the Rehabilitation Act

### (Against Division of Parole, New York City Corrections, Bellevue Men's Shelter, and State of New York)

226. Plaintiff repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

227. Plaintiff is a qualified individual with disabilities as defined by the Rehabilitation Act. He is legally blind and also has nerve damage in both arms and hands, which substantially limits the major life activities of seeing, reading, reading, learning, performing manual tasks, walking, communicating and working, sense of touch, grabbing and holding items.

228. Plaintiff has records of having such disabilities.

229. As a state parolee, Plaintiff met the essential eligibility requirements for the receipt of services or participation in programs or activities provided by DOCCS, Division of Parole, City Corrections, Bellevue Men's Shelter and State of New York.

230. Defendants failed to reasonably accommodate Plaintiff's disabilities and denied him access to BMS and Division of Parole's services, activities and proceedings; to New York City jails' disciplinary and grievance proceedings, as well as the jails' law library, general library, educational, rehabilitative and vocational services, programs and activities.

231. Defendants' failure to reasonably accommodate Plaintiff's disabilities excluded him from participation in services, programs and activities and denied him the benefits of such services, programs and activities.

232. Defendants DOCCS, Division of Parole, City Corrections, Bellevue Men's Shelter and State of New York receive federal financial assistance.

## THIRD CLAIM FOR RELIEF

**Denied Equal Protection: Transportation Accommodation**

**42 U.S.C. § 1983 – Fourteenth Amendment**

**(Against Defendants Corse, Campbell, Division of Parole, DOCCS)**

233. Plaintiff repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

234. Defendants denied Plaintiff transportation accommodations in the form of "home visits" while affording the same accommodation to other disabled parolees.

235. Defendants Corse and Campbell refused to process Plaintiff's requests for transportation accommodations.

236. Defendants Corse and Campbell threatened Plaintiff that if he continued to request disability accommodations that he will be re-incarcerated and his transfer to Illinois will be cancelled and/or delayed.

## FOURTH CLAIM FOR RELIEF

### Denied Equal Protection: Ineffective Communication

### 42 U.S.C. § 1983 – Fourteenth Amendment

### (Against Defendants City Corrections, Corse, Campbell, Division of Parole)

237. Plaintiff repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

238. The failure by Defendants Division of Parole and City Corrections to accommodate Plaintiff during the two parole revocation proceedings violated the ADA, the Rehabilitation Act and also the Equal Protection Clause of the Fourteenth Amendment.

239. Given the failure to provide interpretive services and/or assistive devices at Plaintiff's parole proceedings, he did not receive an opportunity to benefit from the parole process in a meaningful manner or that is equal to that of non-disabled inmates.

240. Plaintiff relied on the ADA computer and Free Matter for the Blind postage, afforded to disabled persons by the United States Post Office, to send mail because he generates correspondence in large print, and thus his mail is bulkier then a sighted persons. This is the reason Congress created the Free Matter postage so that disabled

persons would not be financially burdened from the additional costs of their bulkier parcels.

241. Defendants City Corrections, Copeland, Anderson, Chaplain and Bacon refused to contact the local Post Office to register Plaintiff for the Free Matter postage. Defendants directed Plaintiff to register himself. Plaintiff tried but was not able to. Thus Plaintiff was either financially burdened with the costs of extra postage or unable to send mail because he lacked sufficient funds for postage.

## FIFTH CLAIM FOR RELIEF

### Denied Equal Protection: Incomplete Investigation

### 42 U.S.C. § 1983 – Fourteenth Amendment

### (Against Defendants Corse, Campbell, Doe One, Doe Two, Jane One, Division of Parole, DOCCS)

242. Plaintiff repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

243. Defendants Division of Parole, Doe One, Doe Two, Jane One, Corse and Campbell denied equal protection by neglecting to conduct the prerequisite investigation into the December 21, 2019 incident and the acts alleged by Defendant Colter before revoking Plaintiff's parole due to their existing retaliatory scheme – compounded by some Defendants having a discriminatory motive – caused them to disregard policy, procedure and due process.

244. Defendants conducted the prerequisite investigation and followed policy when revoking other parolees' parole.

## SIXTH CLAIM FOR RELIEF

### Retaliation

### 42 U.S.C. § 1983 – First & Fourteenth Amendments

**(Against Defendants Corse, Campbell, Doe One, Doe Two, Jane One, Shultz, Turkle, Division of Parole, DOCCS)**

245. Plaintiff repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

246. Defendants retaliated because of the settlement in *Medina v. Buther*, 15 Civ. 1955 (SDNY) which Defendants believed Plaintiff used to circumvent normal parole channels and procedures to expedite his inter-state transfer approval.

247. In retaliation, and to be vindictive, Defendants DOCCS, Division of Parole, Shultz, Turkle, Colter, Campbell, Corse, Doe One, Doe Two and Jane One colluded to revoke Plaintiff's parole release outside normal procedures, and without conducting the requisite investigation to have him returned to DOCCS custody and prevent the inter-state transfer.

248. In retaliation, Defendants DOCCS, Division of Parole, Shultz, Turkle, Campbell, Corse, Doe One, Doe Two and Jane One colluded to revoke Plaiantiff's parole release outside normal procedures, by coercing Defendant Jason Colter with money, housing and employment prospects if he falsified events of the December 21, 2019 incident and pursued criminal charges against Plaintiff to have him incarcerated and prevent the inter-state transfer.

## SEVENTH CLAIM FOR RELIEF

## Conspiracy

## 42 U.C.S. §§ 1983 & 1985(2),(3) – Fourteenth Amendment

**(Against Defendants Corse, Campbell, Doe One, Doe Two, Jane One, Shultz, Turkle, Colter, Division of Parole, DOCCS)**

249. Plaintiff repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

250. On December 9, 2019, Illinois approved to accept custody of Plaintiff so that he would be a resident of that State and Illinois would thereafter manage and supervise the remainder of Plaintiff's parole.

251. Defendants conspired to delay and/or prevent Plaintiff's transfer to Illinois because of a previous lawsuit Plaintiff filed against the Division of Parole, (*Medina v. Ramos* [SDNY]) [20] but mainly because of the settlement in *Medina v. Buther*, 15 Civ. 1955 (SDNY) in which Plaintiff, *inter alia*, circumvented normal parole channels and procedures to expedite the inter-state transfer approval.

252. Defendants DOCCS, Division of Parole, Schultz, Turkle, Doe One, Doe Two and Jane One further conspired, at the direction of Defendant Shultz, because Plaintiff had won a substantial monetary award against Defendant DOCCS and its employees and agents, and which had prevented Shultz from keeping his promises to his supervisors.

253. Defendants DOCCS, Division of Parole, Shultz, Turkle, Colter, Campbell, Corse, Doe One, Doe Two and Jane One conspired to revoke Plaintiff's parole release

---

[20] The suit was voluntarily withdrawn by Mr. Medina after he received part of the relief sought in that case.

outside normal procedures, and without conducting the requisite investigation to have him returned to DOCCS custody and prevent the inter-state transfer.

254. Defendants DOCCS, Division of Parole, Shultz, Turkle, Campbell, Corse, Doe One, Doe Two and Jane One conspired to revoke Plaintiff's parole release outside normal procedures, by coercing Defendant Jason Colter with money, housing and employment prospects if he falsified events of the December 21, 2019 incident and pursued criminal charges against Plaintiff to have him incarcerated and prevent the inter-state transfer.

255. Defendants' conspiratorial acts were neither part of their official duties nor done in furtherance of their employer's interests, agenda, or policies.

### EIGTH CLAIM FOR RELIEF

**Denied Due Process: Parole Revocation Proceedings**

**42 U.C.S. § 1983 – Fourteenth Amendment**

**(Against Defendants Corse, Campbell, Division of Parole, DOCCS)**

256. Plaintiff repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

257. Plaintiff was without a reading device or 32 font documents prior to, and during the two revocation proceedings, and consequently he was unable to marshal the facts to prepare meaningful defenses.

258. This left Plaintiff confused at times at to what was occurring and as to the particulars of what was actually alleged he did wrong. Thus, Plaintiff was denied substantive and procedural due process during the two parole proceedings.

## NINTH CLAIM FOR RELIEF

**Deliberate Indifference: Transportation Accommodations**

**42 U.S.C. § 1983 – Eighth Amendment**

**(Against Defendants Corse, Campbell, Division of Parole, DOCCS)**

259. Plaintiff repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

260. Defendants denied Plaintiff transportation accommodations in the form of "home visits" while affording the same accommodation to other disabled parolees.

261. Defendants Corse and Campbell refused to process Plaintiff's request for transportation accommodations.

262. Defendants Corse and Campbell threatened Plaintiff that if he continued to request disability accommodations that he will be re-incarcerated and have his transfer to Chicago stopped and/or delayed.

263. Defendants denied Plaintiff's request for a transportation accommodation, and as a consequence, Plaintiff was hit by a car on three different occasions.

264. Defendants knowingly disregarded the safety risks to Plaintiff's health and well being by refusing to provide him with a transportation accommodation after he requested the accommodation and explained the hazards he was experiencing travelling by himself.

## TENTH CLAIM FOR RELIEF

### Deliberate Indifference: Covid Exposure

### 42 U.S.C. § 1983 – Eighth Amendment

### (Against Defendants Corse, Campbell, Division of Parole, DOCCS)

265. Plaintiff repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

266. Defendants have colluded to keep Plaintiff incarcerated in a Covid 19 breeding and incubation farm, thus placing him at a higher risk of contracting the virus, in total disregard for his health, safety and well being as a reprisal for his recent litigation success and his constant requests for accommodations.

267. Defendant City Corrections, during Plaintiff's incarceration, was understaffed due to the Covid 19 epidemic. This placed Plaintiff's physical safety in jeopardy.

268. Defendants City Corrections is not disseminating gloves, masks, hand sanitizer [21] or disinfectant to the Plaintiff's or to the other detainees and correctional employees [22] at NIC annex. This is placing the Plaintiffs' health and well being in jeopardy.

269. Moreover, City Corrections is prematurely forcing a vast number of correctional officers and other employees whom have tested positive for Covid 19 or who have been exposed to said virus, and who are out sick due to said virus, to return to work. Hence, this is jeopardizing the Plaintiff's health.

---

[21] The reason hand sanitizer is not being issued is correction officials claim detainees can drink it to get drunk. Even if this is true, the sanitizer can be disseminated by an officer thus limiting its misuse.

[22] City correctional employees had brought suit in Queens County Supreme Court to obtain these protective items.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief and enter judgment in their favor:

1) Award Plaintiff compensatory damages for pain, suffering and garden variety emotional damages against all Defendants;

2) Award Plaintiff punitive damages against Defendants Division of Parole, Turkle, Shultz, DOCCS, Corse, Campbell, Colter, Doe One, Doe Two, and Jane One;

3) Declare *New York Executive Law 259-i*, Sections 7 and 8, unconstitutional because it favorably treats hearing impaired and non-English speaking parolees to the discriminatory exclusion of individuals with other disabilities from enjoying and/or receiving the same rights and protections during parole proceedings;

4) Ordering such other and further relief as the Court may deem just, proper and equitable.

DATED: April 25, 2020

Anthony Medina, Pro Se
Ninth Infirmary Command
1500 Hazen Street
East Elmhurst, NY 11370

Pursuant to 28 USC 1746, I declare under penalty of perjury that the foregoing Complaint is true and correct.

Anthony Medina

ANTHONY MEDINA 2412000049
NORTH INFIRMARY COMMAND
15-00 HAZEN ST.
EAST ELMHURST, NY 11370



UFM P3
SDNY

RECEIVED
MAY 14 2020
PRO SE OFFICE

PRO SE CLERK
U.S. DISTRICT COURT
500 PEARL STREET
NEW YORK, NY 10007

CONFIDENTIAL